b

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| **SOMMER NICOLE JOHANSEN-WASHER, Plaintiff** | **CIVIL DOCKET NO. 2:23-CV-01595** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **COMMISSIONER OF SOCIAL SECURITY, Defendants** | **MAGISTRATE JUDGE PEREZ-MONTES** |

**REPORT AND RECOMMENDATION**

Before the Court is a is an appeal by Sommer Nicole Johansen-Washer ("Johansen-Washer") from the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits for lack of disability. ECF No. 1.

Because the final decision of the Commissioner is supported by substantial evidence and no legal error was committed, IT IS RECOMMENDED that Johansen-Washer's appeal (ECF No. 1) be DENIED.

## I. Background

### A. Procedural History

On March 17, 2021, Johansen-Washer filed a Title II application for a period of disability and disability insurance benefits. ECF No. 9-1 at 197–99. Her claim was denied initially and upon reconsideration. *Id.* at 94–97, 108–16. She requested a hearing. *Id.* at 118–19.

An administrative law judge ("ALJ") convened a *de novo* hearing. *Id.* at 41–59. Johansen-Washer, her representative, and a vocational expert ("VE") were present. *Id.* at 41. The ALJ ultimately found that Johansen-Washer was not under a disability within the meaning of the Social Security Act ("SSA") from September 30, 2020, through September 30, 2022, the date last insured. *Id.* at 36.

Johnansen-Washer appealed to the Appeals Council. *Id.* at 191–96. After reviewing the record, the Appeals Council found Johansen-Washer was not disabled from September 30, 2020, through April 4, 2023, the date of the ALJ's decision. *Id.* at 10. Accordingly, the Appeals Council concluded that Johansen-Washer was not entitled to a period of disability or disability insurance benefits. *Id.* at 12. That decision became the final decision of the Commissioner. *Id.* at 5.

Johansen-Washer appealed the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). ECF No. 1.

**B. <u>Medical Records</u>**

On December 12, 2019, Johansen-Washer went to Ochsner LSU Health Shreveport ("Ochsner") for a rheumatology consult. ECF No. 9-1 at 341, 349. She complained of generalized body aches, muscle pain, joint pain, fatigue, and difficulty sleeping. *Id.* She was assessed with fibromyalgia and depression. *Id.* at 351.

On January 7, 2020, Johansen-Washer met with Dr. Nichole Churchman, M.D. ("Dr. Churchman") to discuss her medications. *Id.* at 368. Upon examination, she had epigastric tenderness and abdominal tenderness. *Id.* at 371. Dr. Churchman assessed her with fibromyalgia and depressive disorder. *Id.*

On March 17, 2020, Johansen-Washer met with Dr. Churchman. *Id.* at 364. She complained of a cough with phlegm, month-long rash on her legs and arms, fever, runny nose, and work-related irritability. *Id.* at 364, 366. She also requested shoe inserts to alleviate pain caused by her flat feet. *Id.* at 366. Dr. Churchman assessed her with an upper respiratory infection, folliculitis, and congenital pes planus. *Id.* at 367–68.

On September 28, 2020, Johansen-Washer met with Dr. Churchman to refill her headache and fibromyalgia medications. *Id.* at 360, 362. She reported that she had "been doing well with" those medications. *Id.* at 362. She complained of a week-long cough without sputum, weight gain, rash, itching, periodic headaches, and work-related irritability. *Id.* Dr. Churchman assessed her with a headache, fibromyalgia, and acute bronchitis. *Id.* at 363–64.

On July 22, 2021, Dr. Hussein Alammar, M.D. ("Dr. Alammar") conducted a comprehensive examination of Johansen-Washer. *Id.* at 381–82. Johansen-Washer complained of "diffuse body aches . . . associated with fatigue, insomnia, and paresthesia," generalized weakness, ringing in her ears, dizzy spells, heartburn, insomnia, nervousness, excessive moodiness, and migraines. *Id.* at 383–84. She reportedly could not walk more than a mile, stand more than one hour, or lift and/or carry anything heavier than three to four pounds. *Id.*

During her physical examination, she was able to bend and touch her fingertips to within three inches of the floor and to squat and rise from a squatting position. *Id.* She had an abnormal gait and limp, but her tiptoe walking and heel walking were

normal. *Id.* Her right-hand grip was 4.5 out of 5, and her left-hand grip was 5/5 for normal dexterity and grasping ability. *Id.* She had several fibromyalgia trigger points. *Id.* Dr. Alammar assessed her with fibromyalgia, chronic headaches, and an abnormal gait. *Id.* at 385. Dr. Alammar opined that she did not have any "significant limitation with her walking, sitting, or standing ability," but she could not carry and/or lift anything heavier than twenty pounds. *Id.*

On July 14, 2021, Dr. Kimberly Hutchinson, Ph.D., ("Dr. Hutchinson") conducted a mental status examination of Johansen-Washer. *Id.* at 373–74. Johansen-Washer ambulated without difficulty and had adequate posture and fine and gross motor skills. *Id.* at 377. She appeared mildly depressed and anxious. *Id.*

Dr. Hutchinson found that Johansen-Washer met the criteria for mild to moderate major depressive order and unspecified anxiety disorder with panic attacks. *Id.* at 380. Dr. Hutchinson opined that Johansen-Washer could maintain her concentration for at least thirty minutes for familiar, routine tasks and maintain an adequate pace and persistence for routine tasks. *Id.* Dr. Hutchinson further opined that Johansen-Washer had appropriate social skills, but she believed Johansen-Washer's social skills "would likely deteriorate as stressors increased, impairing her ability to interact effectively with coworkers or receive feedback." *Id.* Dr. Hutchinson found that Johansen-Washer had limited coping skills and an impaired ability "to tolerate the routine[] stressors and adapt to workplace changes." *Id.* Dr. Hutchinson believed that Johansen-Washer's physical health issues exacerbated her anxiety and depression. *Id.*

On August 26, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 441. She complained of worsening depression and anxiety and reported having anxiety attacks two to three times a week. *Id.* She also complained of insomnia and difficulty getting out of bed at times. *Id.* She was diagnosed with persistent depressive disorder and generalized anxiety disorder, and she set four treatment objectives: (1) "[d]escribe situations, thoughts, feelings, and actions associated with anxieties and worries, their impact on functioning, and attempts to resolve them," (2) "[l]earn and implement calming skills to reduce overall anxiety and manage anxiety symptoms," (3) "[d]escribe current and past experiences with depression including their impact on functioning and attempts to resolve it," and (4) "[i]dentify and replace thoughts and beliefs that support depression." *Id.* at 440–41.

On September 2, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 438. She was progressing in all her objectives. *Id.* She reported feeling "a little stressed" because her boss had informed "her that she was in danger of losing her job." *Id.* She rated her depression as a six out of ten, her agitation as a two to three out of ten, and her anxiety as a seven out of ten. *Id.* She had not had any panic attacks, which she attributed to her medication. *Id.* Her mood and affect were anxious. *Id.* at 439.

On September 9, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 434. She was progressing in all her objectives. *Id.* She rated her depression as an eight and a half to a nine out of ten, her agitation as a zero out of ten, and her anxiety as a seven and a half to an eight out of ten. *Id.* at 435. She stated that she had quit

her job and had a "mental break down" afterwards. *Id.* Her mood and affect were anxious. *Id.* at 436.

On September 23, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 431. She was progressing in all her objectives. *Id.* She rated her depression as a six out of ten, her agitation as a zero out of ten, and her anxiety as a six out of ten. *Id.* She reported difficulty falling asleep and staying asleep. *Id.* She was "experiencing negative automatic thoughts and feelings of hopelessness at times." *Id.* She had not had any panic attacks. *Id.* Her mood and affect were both depressed, and she was "tearful at [the] end of [the] session." *Id.* at 433.

On October 7, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 428. She was progressing in all her objectives. *Id.* She rated her depression as a five out of ten, her agitation as a zero out of ten, and her anxiety as a three out of ten. *Id.* She had not had any anxiety attacks. *Id.* She indicated that making diamond art and crocheting "helped her cope with her anxiety and self doubt." *Id.* She "appeared less anxious and depressed than she had in [her] previous session." *Id.*

On November 4, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 424. She was progressing in all her objectives. *Id.* She rated her depression as a five out of ten, her agitation as a seven to eight out of ten, and her anxiety as a six out of ten. *Id.* at 425. She had not been sleeping well, but she had not had any panic attacks. *Id.* She indicated that her new job as a Wal-Mart door greeter was "stressful at times," but she believed it had "been helping with her overall anxiety." *Id.* She attributed her "current agitation, depression, and anxiety" to familial stressors. *Id.* She had been

coping with her increased anxiety and agitation by "doing diamond art and crocheting." *Id.* She presented with a "slightly anxious affect and mood." *Id.*

On November 11, 2021, Johansen-Washer met with Dr. Churchman. *Id.* at 471. She complained of anxiety and reported that she had "been stressed with things at her home" and "with going back to work at Walmart." *Id.* She reported weight gain, periodic headaches, and work-related irritability. *Id.* Dr. Churchman assessed her with headaches and anxiety. *Id.* at 474.

On November 18, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 421. She was progressing in all her objectives. *Id.* She rated her depression as a two out of ten, her agitation as a zero out of ten, and her anxiety as a five out of ten. *Id.* at 422. She indicated that work was "going well," and the stress caused by the number of shoppers during the holiday season had been "manageable." *Id.* She presented with a "calm/pleasant affect and mood" and was observed to have made "significant progress in managing her depression and anxiety." *Id.*

On December 9, 2021, Johansen-Washer met with Dr. Churchman for a follow-up visit for her headaches and anxiety. *Id.* at 467, 469. She reported that she had "been doing a bit better with he[r] moods," and her headaches and irritability were "better with her medication." *Id.* at 469. She complained of intermittent ear pain, congestion, sinus issues, weight gain, periodic headaches, and irritability. *Id.* Dr. Churchman assessed her with headaches, anxiety, and dysfunction of right eustachian tube. *Id.* at 470.

On December 16, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 417. She was progressing in all her objectives. *Id.* She rated her depression as a four out of ten, her agitation as a three out of ten, and her anxiety as a five out of ten. *Id.* at 418. She indicated that she had been stressed because of work, but medication had helped with her anxiety. *Id.* She stated that she "sometimes ha[d] to take a break and do some deep breathing to cope with the stress when a customer [was] rude to her." *Id.* She presented with a slightly anxious and depressed mood and affect. *Id.*

On December 30, 2021, Johansen-Washer went to The Psychology Clinic. *Id.* at 414. She was progressing in all her objectives. *Id.* She rated her depression as a three out of ten, her agitation as a zero out of ten, and her anxiety as a five out of ten. *Id.* at 415. She had had a panic attack the night before, but she reported that her work-related anxiety had "significantly improved since Christmas was over." *Id.* She stated that her "anxiety often fluctuate[d][,] and her depression typically stay[ed] around a 3–4/10." *Id.* She presented with an anxious mood and affect. *Id.*

On January 20, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 411. She was progressing in all her objectives. *Id.* She rated her depression as a five out of ten, her agitation as a two out of ten, and her anxiety as a five out of ten. *Id.* at 412. She had been anxious because of her job, but she had not had any recent panic attacks. *Id.* She presented with a depressed and anxious mood and affect. *Id.*

On February 10, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 408. She was progressing in all her objectives. *Id.* She rated her depression as a four out of ten, her anxiety as a four out of ten, and her agitation as a three out of ten. *Id.*

at 409. She stated she had been "stressed about work and her husband." *Id.* She had a panic attack after a conversation with her husband. *Id.* She presented with a slightly depressed and anxious mood and affect. *Id.*

On February 24, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 405. She was progressing in all her objectives. *Id.* She rated her depression as a three out of ten, her agitation as a zero out of ten, and her anxiety as a zero out of ten. *Id.* at 406. She had been experiencing work-related anxiety. *Id.* She presented with a slightly depressed mood and affect. *Id.*

On March 3, 2022, Johansen-Washer met with Dr. Churchman. *Id.* at 463. She complained of right shoulder pain and spasms and requested pain medication. *Id.* She reported weight gain, periodic headaches, and irritability, but she indicated she was able to manage her irritability with medication. *Id.* at 466. During her physical examination, her trapezius was tender and spasmed. *Id.*

On March 10, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 402. She was progressing in all her objectives. *Id.* She rated her depression as a three out of ten, her agitation as a two out of ten, and her anxiety as a five out of ten. *Id.* at 403. She stated she had been experiencing increased stress related to her job because work had "been busier than normal." *Id.* She had not had any panic attacks but had "experienced some chest pain which she believe[d] [was] related to anxiety." *Id.* She presented with a slightly anxious mood and affect. *Id.*

On April 21, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 398. She was progressing in all her objectives. *Id.* She reported feeling tired and rated her

depression as a two out of ten, her agitation as a zero out of ten, and her anxiety as a four out of ten. *Id.* at 399. She reported having a panic attack at work, but she had been "able to take a break and go to the bathroom" to work through her anxiety. *Id.* She indicated that her anxiety was "heightened on work days, when the weather [was] bad[,] or when there [were] a lot of customers." *Id.* She believed her work-related stress would "be more manageable in [her] new position." *Id.* She presented with a slightly anxious mood and affect. *Id.*

On May 12, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 394. She was progressing in all her objectives. *Id.* She reported feeling tired and rated her depression as a four out of ten, agitation as a zero out of ten, and anxiety as a three to four out of ten. *Id.* at 395. She stated she had not been sleeping well and had some stress-induced migraines. *Id.* Her anxiety and depression had "both been manageable." *Id.* She denied having panic attacks. *Id.* She indicated that work could "be stressful," but she thought the promotion was "a good change." *Id.* She presented with a slightly anxious and depressed affect and mood. *Id.*

On June 2, 2022, Johansen-Washer met with Dr. Churchman for a follow-up visit. *Id.* at 459–60. She indicated that her fibromyalgia medications had been working. *Id.* at 462. She complained of intermittent diarrhea, periodic headaches, and irritability. *Id.* Her irritability had improved due to medication and "the change in her home stresses." *Id.* Dr. Churchman assessed her with primary fibromyalgia syndrome and diarrhea. *Id* at 463.

On June 9, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 391. She was progressing in all her objectives. *Id.* She rated her depression as a three out of ten, her agitation as a zero out of ten, and her anxiety as a zero out of ten. *Id.* at 392. She had not been sleeping well. *Id.* She reported experiencing intermittent mild depression. *Id.* She also reported experiencing "constant stress and mild anxiety due to work." *Id.* She reported experiencing social anxiety "when there [were] a lot of customers at the Walmart she work[ed]." *Id.* However, she indicated that her work stress had been manageable. *Id.* She presented with a slightly depressed affect and mood. *Id.*

On July 14, 2022, Johansen-Washer went to The Psychology Clinic. *Id.* at 388. She was progressing in all her objectives. *Id.* She reported feeling "tired and sad." *Id.* at 389. She rated her depression as a four out of ten, her agitation as a zero out of ten, and her anxiety as a zero out of ten. *Id.* She had forgotten to take her medications for the past few days because of her work schedule changing. *Id.* She reported that her work had been going well and that her work-related stress had been manageable. *Id.* She presented with a slightly depressed affect and mood. *Id.*

On September 1, 2022, Johansen-Washer met with Dr. Churchman for a medication refill. *Id.* at 453–54. She reported that her "moods [had] been suffering with the stress of work." *Id.* She complained of a "crusted, red rash to the cheeks, nose, [and] sometimes [] the forehead," periodic headaches, and irritability. *Id.* Dr. Churchman assessed her with a trapezius muscle strain, primary fibromyalgia syndrome, acquired bilateral pes planus, and rosacea. *Id.* at 458.

C. Administrative Hearing

Johansen-Washer's highest level of education was high school. ECF No. 9-1 at 47. At the time of the hearing, she had been working fulltime as a Wal-Mart cashier for a year. *Id.* She had previously worked at Goodwill for two months. *Id.* at 48. In 2019, she worked at McDonald's for three months. *Id.* at 48–49. From 2016 to 2018, she worked at Walmart as a cashier. *Id.* at 49.

Johansen-Washer then testified about her disabilities. Her most severe problems were her panic disorder and fibromyalgia. *Id.* at 50. Her fibromyalgia purportedly made her fatigued and caused pain in her lower back, upper back, shoulders, neck, and head. *Id.*

As for her panic disorder, she testified that she had panic attacks when she was in enclosed areas, when she was around a lot of people or loud crowds, and during thunderstorms. *Id.* When she had panic attacks, she would "go into the bathroom or into the quiet area to try to calm down" before going back to work. *Id.* at 51. She would either use her allotted break period or talk to her manager and ask "to go sit down to calm down a little bit." *Id.* Whether she was able to take a break outside of her break period depended on how many people were working that shift. *Id.* If enough people were not working, she would "have to wait until [her] break period" to take a break. *Id.* She took medications to treat her panic attacks. *Id.*

Johansen-Washer also testified to having osteoarthritis in her joints, shoulders, hands, and knee. *Id.* at 51–52. She took a "mild pain reliever" as needed to treat her osteoarthritis pain. *Id.* at 52.

She lived with her husband. *Id.* On a typical day, she worked from 9:00a.m. to 6:00p.m. *Id.* at 53. She typically could do her own personal hygiene and dress herself, but approximately twice a week she needed help brushing or washing her hair or bathing. *Id.* She did not drive. *Id.* She swept and mopped the floor in the kitchen and cleaned the kitchen table. *Id.* She prepared a meal once a week. *Id.*

The ALJ then examined the VE. *Id.* at 55–57. The VE classified Johansen-Washer's past work as a cashier/checker. *Id.* at 56.

The ALJ asked the VE to assume a hypothetical individual of the same age, education, and work experience as Johansen-Washer who could perform light work but could only occasionally stoop, kneel, crouch, crawl, and balance when walking on narrow, slippery, or uneven surfaces and must avoid exposure to extreme temperatures and hazardous work environments, such as unprotected heights and dangerous, moving machinery. *Id.* The VE testified that this hypothetical individual would be able to perform Johansen-Washer's past work as a cashier/checker. *Id.* The VE testified that this individual would also be able to work as an office helper, router, or merchandise worker, all of which were light work positions. *Id.* at 56–57.

The ALJ then modified the hypothetical to additionally limit the person to only occasionally reaching overhead. *Id.* at 57. The VE testified that this modification would eliminate the merchandise marker position. *Id.* However, the individual could work as a copy machine operator, which was a light work position. *Id.*

The ALJ then modified the hypothetical to add that the individual could be expected to be off task about 15% of the workday in addition to standard breaks. *Id.*

The VE testified that this modification would eliminate Johansen-Washer's past work and competitive employment. *Id.*

Johansen-Washer's representative declined to examine the VE. *Id.* at 58.

**D. <u>ALJ's Findings and Conclusions</u>**

The SSA promulgated a five-step sequential process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a). This process requires the ALJ to determine whether a claimant (1) is engaging in substantial gainful activity; (2) has a medically determinable severe impairment or a combination of impairments that is severe; (3) has an impairment or combination of impairments listed in or medically equivalent to those listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) has the residual functional capacity to perform his past relevant work; and (5) has the residual functional capacity, age, education, and work experience to perform any other type of work. 20 C.F.R. § 404.1520(a)(4)(i)–(v).

A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)). To be entitled to benefits, an applicant bears the initial burden of showing she is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. *See Greenspan*, 38 F.3d at 237.

Here, the ALJ found that Johansen-Washer had not engaged in substantial gainful activity for a continuous twelve-month period. ECF No. 9-1 at 25. At Step Two, the ALJ found that her fibromyalgia was a severe impairment. *Id.* But at Step Three the ALJ determined that she did not have an impairment or combination of impairments listed in or medically equivalent to one listed in Appendix I. *Id.* at 29.

The ALJ then found that Johansen-Washer had the residual functional capacity to perform light work except she could only occasionally stoop, kneel, crouch, crawl, and balance when walking on narrow, slippery, or uneven surfaces and must avoid exposure to extreme temperatures and to hazardous work environments, such as unprotected heights and dangerous moving machinery. *Id.*

At Step Four, the ALJ determined that Johansen-Washer had the residual functional capacity to perform her past relevant work as a "cashier, checker." *Id.* at 34–35. The ALJ alternatively determined at Step Five that she could work as an office helper, router, and/or merchandise marker. *Id.* at 35–36.

Accordingly, the ALJ concluded that Johansen-Washer was not under a disability as defined in the SSA from September 30, 2020, the alleged onset date, through September 30, 2022, the date last insured. *Id.* at 36.

## II. Law and Analysis

### A. Scope of Review

A court's review of social security disability claims is "exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating

the evidence." *Boone v. O'Malley*, No. 23-CV-40401, 2023 WL 9018388, at *1 (5th Cir. Dec. 29, 2023) (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)).

"When substantial evidence supports the ALJ's findings, these findings 'shall be conclusive' and must be affirmed." *Daigle v. Kijakazi*, No. 22-CV-30721, 2023 WL 4501865, at *1 (5th Cir. July 12, 2023) (citing 42 U.S.C. § 405(g)). For the evidence to be substantial, it must be "more than a scintilla and less than a preponderance," and "of such relevance that a reasonable mind would accept it as adequate to support a conclusion." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

"[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision. [The Court] must consider the record as a whole, and the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986). A court reviewing the Commissioner's decision "may not retry factual issues, reweigh evidence, or substitute [its] judgment for that of the fact finder." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983); *see also Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a Court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Daigle*, 2023 WL 4501865, at *1.

A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See *Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

Here, Johansen-Washer argues the ALJ erred because he (1) did not perform a function-by-function assessment of her capacity to perform work-related mental activities, and (2) improperly evaluated the opinion of Dr. Rachel Morrisey, M.D. ("Dr. Morrisey"). The Court addresses each contention in turn.

**B. <u>The ALJ adequately conducted the function-by-function assessment.</u>**

"The psychiatric review technique . . . requires [the ALJ] to assess a [claimant's] limitations and restrictions from a mental impairment[] in categories identified in the 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings." Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996). The 'paragraph B' criteria includes four broad functional areas: "[u]understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3). Any limitations identified in the "paragraph B" criteria "are used to rate the severity of mental impairment(s) at [S]teps [Two] and [Three] of the sequential evaluation process." 1996 WL 374184, at *4.

"In disability determinations . . . made at [S]teps [Four] and [Five] of the sequential evaluation process . . . , the [ALJ] must assess" the claimant's residual functional capacity. *Id.* at *1. Residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," i.e., "8 hours a day, for 5 days a week." *Id.* The ALJ must assess the claimant's "work-related abilities on a function-by-function basis" and consider "both the [] exertional and nonexertional capacities of the [claimant]." *Id.*

"Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength," such as "mental limitations and restrictions." *Id.* at *6. The mental residual functional capacity assessment requires the ALJ to itemize "various functions contained in the broad categories found in paragraph[] B" and express the claimant's nonexertional capacity "in terms of work-related functions." *Id.* at *4, *6. "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." *Id.* "While the ALJ is not required to use the exact language from his psychiatric review technique, he must consider all of [the claimant's] limitations[,] including those found in the technique." *Owen v. Astrue*, No. 10-CV-1439, 2011 WL 588048, at *13 (N.D. Tex. Feb. 9, 2011).

Here, Johansen-Washer urges that the ALJ "failed to express the various functions 'in terms of work-related mental activities'" and mischaracterized testimony and evidence in his analysis. However, a review of the ALJ's decision demonstrates that he adequately conducted a function-by-function analysis. While the ALJ may not have used the exact terminology set forth in the regulations, the ALJ's analysis addressed all "paragraph B" criteria, and his findings reasonably correspond to work-related functions.

First, the ALJ found that Johansen-Washer's "ability to pay attention depended on her pain level," and she "could follow written instructions very well and did fairly well with spoken instructions depending on her pain." ECF No. 9-1 at 27. Second, the ALJ repeatedly found that "her judgment and reasoning were adequate, and her insight was fair." *Id.* at 28. Third, the ALJ found that she had "no problems getting along with others"[1] and had appropriate social skills.[2] *Id.* at 27. Finally, the ALJ acknowledged that Johansen-Washer testified to not handling changes to her routine well, but he found that "she was able to use coping skills to manage symptoms" and was "able to keep working" if she could not take a break to address

---

[1] Johansen-Washer argues the ALJ's finding that she got along with others was erroneously based on her answering "no" when asked if she had problems getting along with family, friends, neighbors, or others. ECF No. 12 at 6. However, the ALJ's interpretation of her answer to that question was reasonable.

[2] Johansen-Washer argues the ALJ did not explain how appropriate social interactions "with psychological professions . . . relates or translates to 'work-related mental activities.'" ECF No. 12 at 6. However, the ALJ's interpretation of this evidence is, indeed, reasonable. While the environments may be different, her social interactions in that environment may properly be considered. Moreover, the ALJ also discussed evidence about how she handles her work environment.

her panic attacks.[3] *Id.* at 28. Each of these findings correlates to one or more of the work-related mental activities set forth above. *See Jennings v. Comm'r Soc. Sec. Admin.*, No. 14-CV-386, 2016 WL 1182923, at *4 (E.D. Tex. Mar. 28, 2016) ("Although SSR 96-8 requires consideration of the four work-related mental activities, it does not require the ALJ to formalistically recite and discuss all the possible work-related mental activities in his discussion.").

To the extent Johansen-Washer disagrees with the ALJ's interpretation of evidence in his analysis, the Court may not reweigh the evidence or substitute its judgment for that of the Commissioner. In any event, the ALJ's interpretation of that testimony and evidence is eminently reasonable. Johansen-Washer's post-hoc arguments about what her testimony and answers meant do not disturb the reasonableness of the ALJ's findings. Accordingly, the ALJ's assessment is not flawed.

Alternatively, even if the Court were to assume the ALJ erred, the Court finds any such error harmless. "Procedural perfection in administrative proceedings is not required. Th[e] court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). "Remand is required only when there is a realistic possibility that the ALJ would have reached a different conclusion absent the procedural error." *Wilder v. Colvin*,

---

[3] Johansen-Washer argues the ALJ mischaracterized her testimony. ECF No. 12 at 6. During the hearing, she testified that she would go into the bathroom or a quiet area to calm down when needed. *Id.* She testified that when enough workers were not present, she would have to wait until her break period to take a break. *Id.* The ALJ's interpretation that this testimony suggested she could work through panic attacks is reasonable.

No. 13-CV-3014, 2014 WL 2931884, at *5 (N.D. Tex. June 30, 2014). The claimant bears the burden of showing that the ALJ's error was prejudicial. *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012).

Here, Johansen-Washer argues "[t]his error is not without harm" because the VE testified that being off task for 15% of the workday would eliminate her past work and preclude competitive employment. ECF No. 12 at 7. However, the ALJ expressly discussed the extent of her panic attacks and found she could work through them. She fails to explain how the ALJ would have reached a different result had he conducted a more extensive function-by-function assessment. Nor does she cite any evidence unconsidered by the ALJ that would disturb his conclusion. Accordingly, Johansen-Washer fails to satisfy her burden of demonstrating a prejudicial error.

### C. Any error in the ALJ's evaluation of Dr. Morrisey's opinion is harmless.

For claims filed on or after March 27, 2017, the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. *Jones v. Comm'r of Soc. Sec. Admin.*, No. 22-CV-01055, 2022 WL 3509035, at *7 (W.D. La. 2022), *report and recommendation adopted*, 2022 WL 3448676 (W.D. La. 2022) (citing 20 C.F.R. § 404.1520c(a); 20 C.F.R. § 416.920c(a)).

Under the new regulations, rather than assigning weight to the medical opinions, the Commissioner must articulate "how persuasive" he finds the medical opinions. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 416.920c(b)). And the Commissioner's consideration of the persuasiveness of medical opinions is guided

by the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); (4) specialization of the medical source; and (5) any other factors that tend to support or contradict the opinion. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(c)(1)–(5); 20 C.F.R. § 416.920c(c)(1)–(5)).

"Supportability" and "consistency" are the most important factors. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(b)(2); 20 C.F.R. § 416.920c(b)(2)). The ALJ must explain these two factors, but he need not expound on the remaining three unless he finds that two or more non-identical medical opinions are equally well-supported and consistent with the record. *See Jones*, 2022 WL 3509035, at *7 n. 5 (citing § 416.920c(b)(2)–(3)). The fact that a medical source examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(c); 20 C.F.R. § 416.920c(c)).

The regulations direct an ALJ to consider a medical opinion's persuasiveness based on how much the objective medical evidence and medical source's explanation support the medical opinion and how consistent the medical opinion is with the evidence from other sources. *See Harris v. Comm'r of Soc. Sec. Admin.*, No. 20-CV-00910, 2022 WL 421121, at *9 (W.D. La. 2022) (citing 20 C.F.R. § 416.920c(c)).

"Supportability" looks to "the objective medical evidence and supporting explanations presented by a medical source [] to support his . . . medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1). "Consistency" looks to how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2).

"[A]n 'ALJ is not always required to do an exhaustive point-by-point discussion' of the evidence []he reviews." *Silva v. Kijakazi*, No. 22-51045, 2023 WL 3723628, at *1 (5th Cir. May 30, 2023) (quoting *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)). However, the ALJ's explanation "must 'enable[] the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence' and must not 'require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof.'" *Probst v. Kijakazi*, No. 22-CV-00286, 2023 WL 3237435, at *4 (W.D. Tex. May 3, 2023) (alteration original) (quoting *Cooley v. Comm'r of Soc. Sec.*, 587 F. Supp. 3d 489, 499 (S.D. Miss. 2021)). Courts in this circuit have found that this standard requires "a discernible logic bridge between the evidence and the ALJ's persuasiveness finding." *Collar v. Comm'r of Soc. Sec.*, No. 22-CV-1026, 2024 WL 737306, at *6 (M.D. La. Jan. 22, 2024) (quotations omitted), *report and recommendation adopted*, No. 22-CV-1026, 2024 WL 735375 (M.D. La. Feb. 22, 2024).

Here, Dr. Morrisey found that Johansen-Washer had a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining

pace; and a mild limitation in adapting or managing oneself. ECF No. 9-1 at 75. The ALJ found her opined limitations partially persuasive, stating:

> Dr. Morrisey supported her findings by noting the claimant did a full range of activities of daily living; reported fatigue, trouble sleeping, and depression; reported a history of anxiety, insomnia, and irritability related to work; exams by her primary care provider were intact; and she reported anxiety attacks and depression when presenting to the consultative examiner with a depressed, anxious mood (Exhibit B3A at 10). The moderate limitation interacting with others is not consistent with the claimant's intact social skills during her consultative examination despite appearing mildly depressed and anxious (Exhibit B3F at 5). It is not consistent with exams by her own medical sources indicating she had an anxious or depressed mood but otherwise cooperative behavior (Exhibits B5F at 32, 39, 46, 49, 52, 57) with a normal or euthymic affect during other exams (Exhibits B2F at 11; B5F at 36, 43). The moderate limitation is also not consistent with the claimant's noted reduction of panic attacks when she took her medication regularly (Exhibit B5F at 51).

ECF No. 9-1 at 33–34.

Johansen-Washer urges the ALJ failed to adequately articulate the supportability and consistency factors when rejecting Dr. Morrisey's opined moderate limitation in interacting with others. The Court does not agree.

To begin, the ALJ cited the "objective medical evidence and supporting explanations presented by [Dr. Morrisey] [] to support [her] . . . medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1). He found this evidence supported her findings. ECF No. 9-1 at 33. Put differently, the ALJ found that her evidence supported the limitations she opined. A more specified discussion related to the opined moderate limitation was not necessary. The Court can draw the requisite logic bridge between Dr. Morrisey's evidence and the ALJ's supportability finding. Therefore, the ALJ's supportability analysis is adequate.

The ALJ's consistency analysis is also adequate. The ALJ explained that the opined limitation was not consistent with findings made during other examinations. *Id.* at 33–34. The ALJ further found that the moderate limitation was not consistent with evidence of record showing a reduction of her panic attacks when she took her medication regularly. *Id.* at 34. From this explanation, the Court can surmise why the ALJ found Dr. Morrisey's opined moderate limitation unpersuasive. Therefore, the consistency analysis is adequate.

Johansen-Washer cites other evidence of record she believes supports the opined limitation. But the ALJ made the mandatory indication of the basis for his credibility choices. These choices are not unreasonable. And, in any event, it is not this Court's role to reweigh the evidence. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). The ALJ adequately articulated his reasons for finding unpersuasive Dr. Morrisey's opinion that Johansen-Washer was moderately limited in interacting with others. This Court will substitute neither its nor Johansen-Washer's opinion for that of the ALJ's.

Moreover, "[t]he ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it, and the ALJ's decision states explicitly that he considered the entire record in his decision." *Hammond v. Barnhart*, 124 F. App'x 847, 848 (5th Cir. 2005); *see also Brunson v. Astrue*, 387 F. App'x 459, 461 (5th Cir. 2010) ("The fact that the ALJ cited certain evidence that he felt supported his decision does not mean that he failed to consider all of the other evidence in the record."). The ALJ's failure to cite the specific records identified by

Johansen-Washer does not mean he failed to consider them or that his persuasiveness finding was otherwise in error. *See Tomisha M. W. on behalf of T.M.W. v. Saul*, No. 18-CV-2357, 2020 WL 1513453, at *6 (N.D. Tex. Mar. 27, 2020) ("That the ALJ did not specifically mention the particular statements or pieces of evidence that Plaintiff points out on appeal does not discredit his findings.").

In sum, the ALJ adequately articulated his persuasiveness finding for Dr. Morrisey's opined limitations. That finding is proper and adequately supported. Accordingly, remand is not warranted.

## III. Conclusion

Because the final decision of the Commissioner is supported by substantial evidence and no legal error was committed, IT IS RECOMMENDED that Johansen-Washer's appeal (ECF No. 1) be DENIED.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

SIGNED on Tuesday, September 22, 2026.

____________________________________
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE